E. BRYAN WILSON
Acting United States Attorney

DANIEL E. DOTY
Assistant U.S. Attorney
Federal Building & U.S. Courthouse
101 12th Ave., Room 310
Fairbanks, AK 99701
Phone: 907-227-0717
Email: Daniel.Doty@usdoj.gov

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:19-cr-00148-TMB-MMS |
| | ) | |
| CHRISTOPHER ALLEN | ) | |
| CARMICHAEL, a/k/a | ) | |
| "chris_carmichael@lksd.org", | ) | |
| | ) | |
| Defendant. | ) | |

UNITED STATES' SENTENCING MEMORANDUM

I.    SUMMARY OF GOVERNMENT'S RECOMMENDATION

   a. **Prison:**               **40 years**

   b. **Supervised Release:**   **Life**

   c. **Fine:**                 **None recommended**

   d. **Restitution:**          **Not requested at this time**

e. **$100 special assessment + $5,000 JVTA assessment**

## II. FACTS

### a. Offense Conduct

Defendant was an elementary school principal who preyed on children.

He exploited his position of authority to befriend a young girl, L.E., when she was in *fourth grade*. Dkt. 69 at ¶ 7. He told her to call him dad while her real father was in jail. *Id*. For two to three years he acted like he cared about her and carefully cultivated a safe space at his elementary school for her to play and feel comfortable when things in her life were not going well. Then he started groping her while she was playing in the school gym. *Id*. at ¶ 8.

He then started texting another 13-year-old minor (thankfully a fictitious one) named "J," who he thought was L.E.'s cousin. *Id*. at ¶ 10. He texted "J" and told her to masturbate for him. *Id*. at ¶ 12. He told J he thought it would be "fun" to make pornography together, but that she should not tell anyone. *Id*. at ¶ 12. While he was making efforts to meet up with her he described, in explicit detail, all the sexual acts he wanted to do with her, told her he wanted to pretend to be her dad and take her to Victoria's Secret, and openly fantasized about having a threesome with "J" and L.E. (who, again, he believed were related). *Id*. at ¶ 12-13, 15.

Even as he was doing this, he was still contacting L.E. and asking her to make pornography for him and with him. *Id*. at ¶ 17-18. He arranged to meet L.E. at a hotel in Bethel and told her he would bring something "lacy" for her to wear so they could make

a video together. *Id*. at ¶ 17. He told her he had also bought a thumb drive to give to her in the hopes that she'd make a video to put on it for him. *Id*. at ¶ 18. He told L.E. he had masturbated to the thought of her "thousands of times," and told her he loved her. *Id.* at ¶ 18. When police arrested him at his home, they found a thumb drive with child pornography on it and screenshots that indicated he had been shopping for lingerie. *Id.* at ¶ 19.

### b. Other Conduct

This is not the only time Defendant preyed on children. He had been previously reported – twice – to his supervisors for sexual harassment or misconduct with current and former students. These investigations are detailed in an Information filed in *State v. Christopher Carmichael*, 4BE-20-00362CR, which is attached as **Exhibit A**.

The first time, the Alaska State Troopers learned that Defendant had sent inappropriate messages to a 14-year-old girl who had been his student at a school elsewhere in the district. Among the messages: "love those luscious red lips on your profile pic :-)" "I know you and your naughty ways too well :-)" "you can't escape my all-seeing eye! :-)" and "bend you over my knee and whackkk! :)". The girl's mother brought the messages to the attention of police, who raised them with the school district. The Defendant admitted sending the messages but said he was "heavily medicated" at the time. Defendant remained employed as an elementary school principal.

In 2018, the Bethel Police Department received a report that Defendant had deliberately touched the breast of an eleven-year-old girl in his office at the school. When

Case 3:19-cr-00148-TMB-MMS   Document 70   Filed 07/06/21   Page 3 of 24

confronted by the girl's mother, Defendant stated in a recorded phone call that "he was probably joking around." Defendant later told the girl's father that "he must have accidentally" touched the child and that "he was really sorry and he had a reputation to protect." No action was taken: Defendant was still employed at the time he started abusing L.E. and reaching out to J.

### c. Victim and Community Impact

L.E. and her mother are expected to present written impact statements which will be filed separately as addenda to the presentence report.

In this case, two other community institutions – the Tundra Women's Coalition, which operates the local Child Advocacy Center in Bethel, and Bethel City Council – have both prepared statements that reflect the wide-ranging impact of Defendant's conduct in the region. These statements are attached as **Exhibits B** and **C.**

## III. SENTENCING CALCULATION

### a. Statutory Penalty Range

    i. **10 years to life imprisonment. 18 U.S.C. § 2422(b)**

    ii. **5 years to life on supervised release. 18 U.S.C. § 3583(k)**

    iii. **Up to a $250,000 fine. 18 U.S.C. § 3571(b)(3)**

    iv. **$100 special assessment. 18 U.S.C. § 3013(a)(2)(A)**

    v. **$5,000 additional special assessment under the Justice for Victims of Trafficking Act. 18 U.S.C. § 3014(a)(4).**

    vi. **Mandatory restitution if requested. 18 U.S.C. § 2429(a).**

### b. Guideline Calculation

#### i. Summary

The guidelines counsel a life sentence for this Defendant. His offense level is 46. He was convicted under 18 U.S.C. § 2422(b) for the attempted enticement or coercion of a minor, and his conduct included the solicitation of sexually explicit photos. The analysis thus requires the Court to calculate Defendant's guideline range under U.S.S.G. §§ 2G1.3 *and* 2G2.1, then apply whichever would lead to a higher sentence. U.S.S.G. § 2G1.3(c)(1).

The discussion of offense levels below is thus divided into two sections: the first contains the analysis under § 2G1.3, while the second contains the analysis under § 2G2.1. Applying § 2G1.3 would lead to an offense level of 40. Applying § 2G2.1 would lead to an offense level of 46, so § 2G2.1 controls the sentence. Given the offense level, criminal history category is irrelevant: at offense levels of 43 and higher all categories carry a guideline sentence of life imprisonment.

#### ii. Offense Level

##### 1. U.S.S.G. § 2G1.3 leads to an offense level of 40

###### a. Application Note

Under this guideline, if the relevant offense conduct involved more than one minor, the grouping rules should be applied as if the persuasion, enticement, or coercion of each separate minor had been contained in a separate count of conviction. U.S.S.G. § 2G1.3(d)(1).

U.S. v. Carmichael                   Page **5** of **24**
3:19-cr-00148-TMB-MMS

### b. Specific Offense Characteristics: L.E.

The base offense level is 28 because the offense of conviction was § 2422(b). U.S.S.G. § 2G1.3(a)(3).

A 2-level enhancement applies under subsection (b)(1) because L.E. was in the custody, care, or supervisory control of the defendant. Defendant had an unusually close relationship with L.E. starting when she was a fourth grader at the elementary school where he served as principal. He told her she could call him "dad" when her own father was in jail, and acted as a mentor to her. Dkt. 69 at 9, ¶ 7. After she moved up to the high school to start 7th grade, she went back to the elementary school before and after school to play in the gym and see the Defendant, who was still the principal. *Id*. at ¶ 8.

It was during one of these visits that Defendant started touching L.E., starting a pattern of behavior that took place almost entirely at the school or over the internet. The abuse would not have occurred in this fashion without that relationship between L.E. and Defendant, and that relationship never would have existed without Defendant's authority over the young children – including L.E. – that the community trusted him to care for and keep safe.

The PSR writer did not apply this enhancement, reasoning that L.E. was no longer a student in Defendant's school so "he did not have any supervisory control over L.E." Dkt. 69 at 24 (Emphasis added). This is not a fair reading of the guideline or the facts: the trust relationship between Defendant and L.E. is essential to understanding this case. Application Note 2 to § 2G1.3 states that this subsection "is intended to have a broad

Case 3:19-cr-00148-TMB-MMS   Document 70   Filed 07/06/21   Page 6 of 24

application and includes offenses involving a victim less than 18 years of age entrusted to the defendant, whether temporarily or permanently." Application of the rule depends on "the actual relationship that existed," not the legal status of the relationship, and such relationships include "teachers, day care providers, baby-sitters, or other temporary caretakers." *Id.*

This Court can take its pick of the supervisory relationships Defendant exploited to facilitate his sexual abuse. First, the abuse never would have happened if L.E. had not at one time been his student, so that principal-student relationship is essential to understanding the facts of the case. Second, even at the time the abuse occurred L.E. was a student in the school district Defendant worked for, playing in the school he supervised. If she had broken the rules at the school, no one could possibly argue that Defendant would have lacked the authority to do anything about it. Third, Defendant was acting as a babysitter or temporary caretaker. He was watching and supervising a child just out of elementary school before and after school hours.

All this, of course, pales in comparison to the last relationship Defendant violated, and the one that wounded L.E. and her family most deeply. To L.E., Defendant wasn't just a one-time principal, or a baby-sitter, or a caretaker: she thought he was a friend, mentor, and father figure. At a time when she was vulnerable, Defendant pretended to be a caring educator to make her feel safe and comfortable, then pretended to be a caring stand-in for her own father while he was in jail. She clearly relished the stability and care Defendant appeared to provide, going to his school regularly to visit him. Then after three

Case 3:19-cr-00148-TMB-MMS   Document 70   Filed 07/06/21   Page 7 of 24

years that started when he was her principal and ended when he was her mentor he molested her, told her he wanted to have sex with her, and tried to get her to meet in a hotel to make pornography with him and for him. Dkt. 69 at ¶ 8-10, 17-19. This Court should have no doubt that the guideline enhancement applies to such a betrayal of trust and authority.

A 2-level enhancement applies under subsection (b)(3) because Defendant used a computer or interactive computer service. Defendant used texts and Facebook messenger to attempt to arrange a meeting with L.E. to have sex and produce child pornography. Dkt. 69 at ¶ 14, 17.

A 2-level enhancement applies under subsection (b)(4) because the offense involved sexual contact. "Sexual contact" has the meaning given in 18 U.S.C. § 2246(3), namely the intentional touching, either directly or through the clothing, of a variety of body parts including the breast and inner thigh. Defendant engaged in sexual contact with L.E. at his school. Dkt. 69 at ¶ 8.

A 2-level enhancement applies under § 3C1.1 because Defendant attempted to obstruct the investigation into his abuse of L.E. The guideline includes failed attempts at obstruction: "for purposes of the obstruction adjustment, it is irrelevant whether justice is actually obstructed or impeded." *United States v. Draper,* 996 F.2d 982, 986 (9th Cir. 1993). Application Note 4 explains that covered conduct includes "false statement[s] to a law enforcement officer" that would significantly obstruct or impede the official investigation or prosecution. Note 6 also clarifies that the question is not whether the

Government did believe or would have believed false statements, but whether, *if* the Government believed the statements, they would have influenced or affected the outcome. In this case, Defendant asked L.E. to recant statements she had made about his sexual abuse, then lied to the officers about his intent to meet with L.E. to have sex: the subject of his lies was the conduct at the center of the case, so the statements were material. Dkt. 69 at ¶ 18-19.

The offense-specific enhancements under § 2G1.3 for the conducted directed at L.E. total 36.

### c. Specific Offense Characteristics: J

All of the same enhancements apply to J except position of authority and commission of a sex act. The applicable enhancements apply for the same reasons, except that in J's case the obstruction enhancement applies because Defendant instructed J to delete incriminating text messages and call logs. Dkt. 69 at Paragraph 15.

The offense-specific enhancements under § 2G1.3 for the conduct directed at J is 32.

### d. Grouping

A 2-level enhancement applies to the higher of the two offense levels because there are two units of prosecution under the grouping guideline at U.S.S.G. § 3D1.4. As previously explained, the grouping rules apply to determine the overall offense level. U.S.S.G. § 2G1.3(d)(1). Each victim is treated as a separate group. U.S.S.G § 2G1.3(d)(1), Application Note 6. Each group counts as a single unit of prosecution

Case 3:19-cr-00148-TMB-MMS   Document 70   Filed 07/06/21   Page 9 of 24

because the difference in offense levels is between 1 and 4. U.S.S.G. § 3D1.4(a). There are thus two units of prosecution, leading to a 2-level enhancement to the conduct against L.E.

### e. Chapter 4 Enhancement

A 5-level enhancement applies under § 4B1.5(b) because Defendant engaged in a pattern of activity involving prohibited sexual conduct against minors. This enhancement applies where the instant offense is a covered sex offense (which includes convictions under 18 U.S.C. § 2422(b)) and the defendant does not have prior convictions for sex offenses but did engage in a pattern of activity involving prohibited sexual conduct. "Pattern of conduct" can include the conduct giving rise to the instant offense of conviction. Application Note 4(B) to § 4B1.5(b). The term also does not require conviction, and only requires at least two separate or attempted acts of unlawful sexual conduct. Here, Defendant was convicted for sexual abuse of a minor in state court against L.E. See Dkt. 69, ¶ 41. He also committed offenses under 18 U.S.C. § 2422 against both L.E. and J., so there is a pattern of conduct.

### f. Acceptance of Responsibility

The Government does not dispute that a 3-level downward adjustment applies for acceptance of responsibility.

### g. Total Adjusted Offense Level Under § 2G1.3

Case 3:19-cr-00148-TMB-MMS   Document 70   Filed 07/06/21   Page 10 of 24

The total adjusted offense level under § 2G1.3 is 40. 36 for conduct directed at L.E., plus 2 for conduct directed at J under the grouping rules, plus 5 for the Chapter 4 enhancement, minus 3 for acceptance of responsibility.

## 2. U.S.S.G. § 2G2.1 leads to an offense level of 46.

### a. Application Note

As with U.S.S.G. 2G1.3, if the offense involved the exploitation of more than one minor, the offenses should be grouped as if the exploitation of each minor had led to a separate count of conviction. U.S.S.G. § 2G2.1(d).

### b. Specific Offense Characteristics: L.E.

The base offense level under § 2G2.1(a) is 32.

A 2-level enhancement applies under subsection (b)(1)(B) because L.E. was older than 12 but younger than 16.

A 2-level enhancement applies under subsection (b)(2)(A) because the offense involved the commission of sexual contact. See above.

A 2-level enhancement applies under subsection (b)(5) because L.E. was in the custody, care, or supervisory control of the defendant. See above.

A 2-level enhancement applies under subsection (b)(6) because the Defendant used a computer or interactive computer service to commit the offense. See above.

A 2-level enhancement applies under 3C1.1 for obstruction. See above.

Under 2G2.1, the total offense level for conduct directed at L.E. is 42.

### c. Specific Offense Characteristics: J

Case 3:19-cr-00148-TMB-MMS   Document 70   Filed 07/06/21   Page 11 of 24

All of the same offense guidelines apply except sexual contact and supervisory control, so the total offense level for J would be 38.

### d. Grouping

A 2-level enhancement applies to the higher of the two offense levels because there are two units of prosecution under the grouping guideline at U.S.S.G. § 3D1.4. See above.

### e. Chapter 4 Enhancement

A 5-level enhancement applies under 4B1.5(b) because Defendant engaged in a pattern of activity involving prohibited sexual conduct against minors. See above.

### f. Acceptance of Responsibility

The Government does not dispute that Defendant is entitled to a 3-level downward adjustment for acceptance of responsibility.

### g. Total Adjusted Offense Level under § 2G2.1

The total adjusted offense level is 46 under § 2G2.1. 42 for conduct directed at L.E, plus 2 for grouping rules for conduct directed at J, plus 5 for the Chapter 4 enhancement, minus 3 for acceptance of responsibility.

### iii. Criminal History Category

Defendant's lack of prior convictions places him in criminal history category I. However, at an offense level of 46 Defendant's criminal history category is ultimately irrelevant: in all categories, that offense level counsels a sentence of life imprisonment.

####    iv.    Restitution

Restitution is mandatory pursuant to 18 U.S.C. § 2429(a) for any losses suffered by the victim in connection with the offense. L.E., however, is not currently requesting restitution.

####    v.    JVTA Assessment

The Justice for Victims of Trafficking Act requires the Court to impose a $5,000 special assessment against "**any non-indigent person** or entity convicted of an offense under . . . chapter 117," which includes violations of 18 U.S.C. § 2422. 18 U.S.C. § 3014 (emphasis added). Summarizing the state of the law in multiple circuits that have addressed the question, the Sixth Circuit explained that a district court should consider both the defendant's current ability to pay and the defendant's earning capacity to resolve the indigency question. *United States v. Shepherd*, 922 F.3d 753, 757 (6th Cir. 2019) (collecting cases from the Fourth, Fifth, Eight, and Tenth Circuits).[1] "The district court must resolve two basic questions in assessing the defendant's indigency: (1) Is the defendant impoverished *now*; and (2) if so, does the defendant have the means to provide for himself so that he will *not always* be impoverished?" *Shepherd*, 922 F.3d at 758.

In *Shepherd* the Court upheld imposition of a JVTA assessment against a defendant despite the following facts: (1) he had $1,939 in debts offset by his only asset, a truck worth $200, for a negative net worth of $1,739; (2) he would be expected to owe

---

[1] Undersigned counsel was unable to locate any authority from the Ninth Circuit directly addressing the issue.

U.S. v. Carmichael
3:19-cr-00148-TMB-MMS

$55,000 in child support and restitution after his release from prison, (3) he had been working part time jobs for around $10 an hour before his sentence, and (4) his expected earnings from prison jobs would be between $0.12 and $0.40 per hour for eight years. *Id.* at 756.

Here, Defendant was a full-time school administrator for many years. He has $5,000 in a bank account, cars worth $20,000, and a home in his name and his wife's that is likely worth around $225,000. His bank account alone would support payment of the JVTA assessment: the existence of other debts does not change the fact that he has the money to pay the assessment if required. Some or all of his debts may transfer with their related assets to Defendant's wife in the divorce (the mortgage may be reassigned with the house, for example), or could be discharged in bankruptcy proceedings. 11 U.S.C. §§ 727, 523. The Court can order Defendant to pay $5,000 to cover the JVTA assessment and leave it to Defendant to sort out how to handle his other liabilities.

## IV.    PROBATION OFFICER RECOMMENDATION

The probation officer recommends a sentence of 180 months followed by supervised release for the remainder of the defendant's life.

## V.    GOVERNMENT'S RECOMMENDATION

### a.  Summary

The Government recommends a 40-year sentence (480 months) for Defendant, followed by supervised release for the remaining period of Defendant's life. Defendant was an elementary school principal. He carefully cultivated the trust of a fourth-grade girl

for three years before groping her in the gym of his school, then tried to convince her and her fictional friend, "J", to meet up with him to have sex and make pornographic videos. All this came on the heels of reports that he had touched another eleven-year-old student's breasts and sent sexual messages to a fourteen-year-old former student. Further compounding the harm Defendant caused, he did this in a community that suffers an epidemic of sexual violence against children and continues to deal with a decades-long legacy of sexual abuse at the hands of educators and other caretakers.

### b. A 40-year sentence best reflects the offense conduct

Among the very first factors the Court is directed to consider are the nature and circumstances of the offense and the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. 18 U.S.C. § 3553(a)(1), (2)(A). These factors support ordering Defendant to serve forty years in prison.

His actions are appalling. They deeply wounded L.E., a real child who trusted him for the stability he seemed to provide. Not only that, they deeply wounded the community: in a region where sexual abuse against children by educators and caregivers went unaddressed for decades, Defendant's actions as an elementary school principal fundamentally undermined the cautious trust that families throughout the region had once again started to place in the public school system.

Carmichael was not an adult who L.E. knew casually. He was her school principal. He exploited that position of authority to befriend the victim when she was in *fourth*

Case 3:19-cr-00148-TMB-MMS   Document 70   Filed 07/06/21   Page 15 of 24

*grade*. He told her to call him dad while her real father was in jail. He acted like he cared about her, and carefully maintained a safe space at his elementary school for her to play and feel comfortable when things in her life were not going well. Then, after three to four years, he broke that trust and started sexually abusing her. He also tried to get her and a person he thought was her 13-year-old cousin to meet up with him to have sex and make pornographic movies.

All this would be appalling enough on its own, but the context in which it occurred makes it even worse. The Yukon-Kuskokwim Delta continues to wrestle with a legacy of sexual abuse at the hands of non-Native educators that has persisted for decades. Sexual abuse of children was rampant in churches and missions in western Alaska throughout the 20th century.[2] Research has also documented extensive sexual abuse at the hands of teachers and staff at the boarding schools many Alaska Native children were compelled to attend during the same period.[3] Many of these caregivers never faced any

---

[2] In 2007, 110 Alaska Native victims resolved a civil suit over the sexual abuse they suffered as children at the hands of 12 Jesuit priests and three volunteers in western Alaska between the 1940s and 1970s. *Jesuits settle Alaska abuse claims for $50 million*, Lisa Demer, ADN.com (Nov. 20, 2007) (available at https://www.adn.com/alaska-news/2019/07/25/from-2007-jesuits-settle-alaska-abuse-claims-for-50-million/) (last updated July 25, 2019). A substantial amount of sexual abuse was focused on the Yukon-Kuskokwim Delta region: fifteen priests accused of sexual abuse were stationed in St. Mary's, a village near Bethel, between 1927 and 1998. *These priests abused in Native villages for years. They retired on Gonzaga's campus.* Emily Schwing, APRN (Dec. 17, 2018), available at https://www.alaskapublic.org/2018/12/17/these-priests-abused-in-native-villages-for-years-they-retired-on-gonzagas-campus/.

[3] In 2005, for example, researchers at the University of Alaska at Anchorage interviewed 62 Alaska Native adults who had been compelled to attend boarding schools between the 1940s and 1980s: of these 62, 12 shared on record their experiences with sexual abuse or

repercussions for their actions, and this history has continued to the present day: in just three years preceding Defendant's abuse of L.E. at least three different teachers in villages along the lower Kuskokwim River were discovered to be engaging in illegal sexual conduct involving minors, only one of whom was convicted for a felony.[4] This history undermined the trust of Alaska Native communities in those institutions that exist to serve them.

Thanks to this history abusers like Defendant have a wide-ranging impact, harming not just the victim but the community. Countless dedicated professionals have been working tirelessly in western Alaska to counteract this legacy of abuse, rebuild the

---

harassment and still more shared experiences that were not included in the official tally at the request of the interviewees. Hirshberg, D. et al, *Thirty Years Later: The Long-Term Effect of Boarding Schools on Alaska Natives and Their Communities* at 11 (Sept. 2005), *available at* https://iseralaska.org/static/legacy_publication_links/boardingschoolfinal.pdf. All but one of the interviewees stated that no disciplinary action was taken against their abusers, and that "they had no effective avenue of reporting abuse." *Id.*

[4] In 2014 the local school district settled a lawsuit with the families of nine girls in Tuluksak who were abused by a shop teacher named Martin Bowman, after Bowman inappropriately touched and exposed himself to them. Bowman was not prosecuted. The next year, a 31-year-old teacher named Michael Wier was charged with sexually abusing a fifteen-year-old student in Kwigillingok. He later pled guilty to harassment, a misdemeanor. The year after that another Tuluksak teacher, John Paul Douglas, was found in possession of over 2,000 images of child pornography on his work laptop. Douglas was the only one of these three convicted for a felony. For further details on each case, see *A rural Alaska school district said it was blindsided by its principal's arrest. Except he'd been investigated twice before.* Kyle Hopkins & Greg Kim (May 12, 2020) (available at https://www.ktoo.org/2020/05/12/a-rural-alaska-school-district-said-it-was-blindsided-by-its-principals-arrest-except-hed-been-investigated-twice-before/).

trust of Alaska Native communities in schools and other institutions, and do what those institutions were created to do: serve their communities.

This effort has been fruitful. As Defendant himself learned, people in Bethel wanted to trust him. They were ready to trust him around their children, and to trust him to use his authority over other teachers and school staff to make sure the entire learning environment was a safe and healthy one. Defendant saw that trust, cultivated it, then took a sledgehammer to it. This hurt L.E., the other children Defendant abused, and all the children and parents in the community who once again feel that their kids might not be safe in the classroom.

This Court can help turn the tide. Defendant, like too many before him, enjoyed for too long the freedom to abuse Alaska Native children without interference from the many safeguards, checks, and balances that might keep children safe in a less remote place. But Defendant, like too few before him, was caught. And now this Court can impose a sentence that will tell this Defendant, his victims, and the people of rural Alaska that the United States will not tolerate the sexual abuse of children no matter where it happens, and the children of rural Alaska have as much right as any American to feel safe in their schools, homes, and communities.

### c. Deterrence & Protection of the Public

Specific and general deterrence are vitally important in a case like this to protect the community from ongoing abuse. Part of the motivation for Defendant and others in rural Alaska who have committed similar crimes is the belief that they will never be

Case 3:19-cr-00148-TMB-MMS   Document 70   Filed 07/06/21   Page 18 of 24

caught. They think it unlikely that anyone will ever even learn what they did and – as Defendant himself experienced with the first children he touched and texted – even if someone with authority does find out, nothing will happen. A significant sentence in this case would go a long way to show that those days are over. Law enforcement will catch serial abusers, no matter how remote they might be, and hold them to account.

### d. Sentencing Disparities

#### i. *United States v. Nekeferoff*

The Government's recommendation is consistent with the 50-year sentence this Court imposed in *United States v. Justin Nekeferoff*.[5] Like Defendant, Nekeferoff was convicted for the attempted enticement of a minor. He contacted "Jennifer," a law enforcement officer who was posing as the mother of an 8-year-old girl, and asked her to groom the girl to engage in sex acts with him. Though Nekeferoff was also convicted for the possession of child pornography, the Court imposed a lower sentence on that count and ran it concurrent to the sentence for enticement. In any event Defendant was also found with child pornography, *and* he was actively trying to get minors to have sex with him to make pornography. Like Defendant, Nekeferoff received a five-level enhancement for a pattern of conduct involving the sexual abuse of minors. And like Defendant's, Nekeferoff's guideline sentence was life imprisonment, though in Nekeferoff's case it was actually based on an offense level of 43, three levels *lower* than Defendant.

---

[5] Though Mr. Nekeferoff's case was reversed on appeal, 843 Fed.Appx. 876 (9th Cir. 2021), the reversal was unrelated to the length of the sentence.

Case 3:19-cr-00148-TMB-MMS   Document 70   Filed 07/06/21   Page 19 of 24

Some aggravating factors were present in each case that were not present in the other. Defendant was abusing his position as an elementary school principal to try to have sex and make pornography with girls who are 40 years younger than he is, and he attempted to obstruct the investigation against him. Nekeferoff had sexually abused his younger sister when he was a child, and had sex with a teenager when he was in his 20s before the conviction that led to his 50-year sentence. A 40-year sentence for Defendant appropriately considers the common ground between the two cases and the aggravating factors unique to each one.

Other defendants convicted in recent years of similar crimes have received significant terms of imprisonment, including life. In *United States v. Schopp*, 1:15-cr-00001-TMB, this Court sentenced a serial sex offender who engaged in sex with a 16-year-old to life imprisonment. In *United States v. Templeton*, 3:17-cr-00026-TMB, this Court imposed a 40-year sentence against a Defendant who had sexually abused his own child and offered to let another man have sex with her. In *United States v. Davis,* 4:17-cr-00003-RRB, the Court sentenced Defendant to 35 years in prison for producing pornography with children his girlfriend was babysitting.

There are some distinctions, though on balance these distinctions justify treating Defendant like the others listed above. Defendant does not have a documented history of penetrative sex with minors. However, that was clearly his goal here. He possessed child pornography. He had sexual contact with at least two minors, one of whom was 11 years old and the other of whom, L.E., was 13 at the time the abuse started. He also tried to

arrange to meet with L.E. and another minor, "J", to have penetrative sex and create child pornography together. And, unlike the other defendants, he did this as an elementary school principal with unfettered authority over and access to all of the minors in a rural community, an abuse of trust that sent shockwaves throughout the community. These facts counsel a similar sentence to these other defendants.

### ii. *United States v. Larsen*

The presentence report raises an unfounded comparison to *United States v. Eric Larsen* to argue for a downward departure so substantial it would render the guideline recommendation meaningless. Congress cautions courts to impose a sentence that would "avoid **unwarranted** sentence disparities among **defendants with similar records** who have been **found guilty of similar conduct.**" 18 U.S.C. § 3553(a)(5) (emphasis added). Beyond the fact that Larsen and Carmichael both wanted to have sex with teenaged girls, there are no similarities between the cases or the history of the offenders, and the distinctions all justify a much higher sentence for Carmichael.

In Larsen's case the Court concluded that Larsen's guideline range was 135-168 months. Larsen had hired the victim, who was a friend of his niece, to babysit his kids, exposed himself to her when he was giving her a ride to the job, and tried to arrange to meet her later to have sex when officers pretending to be the victim contacted him. He rightfully received a significant penalty that clearly reflected the Court's condemnation of his unacceptable attempt to have sex with a young girl.

Case 3:19-cr-00148-TMB-MMS   Document 70   Filed 07/06/21   Page 21 of 24

However, a harsher sentence in this case reflects that Carmichael did everything Larsen did, and more, while he occupied a position of authority. Carmichael's guideline sentence is life imprisonment, Larsen's was not even close. Larsen did not put his hands on a child. He was not an elementary school principal. He did not have ready access to all the young girls in a rural community already damaged by decades of sexual abuse at the hands of educators and other "public servants." He did not carefully cultivate the trust of a fourth-grader who was entrusted to his care for three years, masturbate to the thought of her "thousands of times," molest her in a school gym, ask her and another minor to make pornography with him, or attempt to start an ongoing romantic relationship with her. He did not qualify for a sentencing enhancement for a pattern of unlawful sexual conduct against minors. He had not been twice reported to his employer for predatory messages or physical contact with other children before abusing the victims in this case. Carmichael and Larsen are not alike, and there is no basis in the facts of the case or in their histories that would justify treating them similarly.

What's more, a fifteen-year sentence for Carmichael is an unreasonable departure from the guideline range. At 18 U.S.C. § 3553(a)(4)(A), Congress directed judges to consider the sentencing range set forth in the guidelines. The ten-year sentence Larsen is serving was only one year less than the low end of his guideline range of 11 to 14 years. Here, Carmichael's guideline recommendation is *life imprisonment* based on an offense level of 46. A fifteen-year sentence would ignore almost all the factors that led to the guideline recommendation here. The probation officer's 15-year recommendation fails to

reflect facts that justified almost fourteen points worth of enhancements: the base offense level of 32 on its own, with no other enhancements at all, would lead to a recommendation just 2.5 years short of the probation officer's. It would not reflect any of facts that support the numerous enhancements justifying a guideline recommendation of life, and the Court should not impose a sentence that does not take all the relevant conduct into consideration.

### e. Adjustments for Anticipated State Sentences

The Court should not adjust the total sentence in this case based on the belief that additional consecutive time will be imposed for relevant conduct in a pending state proceeding. As part of a plea agreement with the Defendant, the State of Alaska has agreed that any time imposed against Defendant in the State case should run concurrently to the sentence this Court imposes here. **See Exhibit D.** Thus he will not be receiving any additional time on his state charges.

## VI.   CONCLUSION

The Court should impose a 40-year (480-month) sentence, followed by supervised release for the remainder of Defendant's life, and impose the $100 special assessment and $5,000 JVTA assessment. This sentence would be a just and proportional punishment for Defendant's abuse of his position as an elementary school principal to try to have sex with and make pornography with children. It would also reflect the broader impact of Defendant's crimes on the community and, hopefully, deter future offenders who may have otherwise believed that rural Alaska is beyond the reach of the law. This sentence

would be consistent with the sentencing guidelines and with sentences imposed in other similar cases.

RESPECTFULLY SUBMITTED this 6th day of July, 2021, in Fairbanks, Alaska.


E. BRYAN WILSON
Acting United States Attorney


_s/ Daniel E. Doty_
DANIEL E. DOTY
Assistant U.S. Attorney


**CERTIFICATE OF SERVICE**

I hereby certify that on July 6, 2021,
a true and correct copy of the foregoing
was served electronically on all counsel of
record via the CM/ECF system:

_s/ Daniel E. Doty_
Office of the U.S. Attorney